## NEWTON and others *v.* JOSLIN and others.

*(Circuit Court, D. Colorado.* May 24, 1887.)

JUDGMENT—SETTING ASIDE IN EQUITY—CORRUPTION OF JUDGE.

The trial judge went to the office of the defendant's counsel to notify him to be present in court at a certain hour, when he would discharge a hung jury, but merely sent a message to the same effect to the plaintiff's counsel. On the second trial, which was heard without a jury, he spoke harshly to the plaintiff for a formal omission by her, when taking the oath, and he decided the case in favor of the defendant, upon the conclusion of one argument for the plaintiff, without hearing argument for the defendant or further argument for plaintiff from her principal counsel. The defendant's counsel was seen during the progress of the case in the judge's chambers adjoining the court-room, where he was waiting for court to open. *Held,* in a suit in equity by the plaintiff to set the judgment aside, because of the corruption of the judge, that these facts showed not even the slightest misconduct upon his part.

In Equity.

*T. A. Green* and *H. B. Johnson,* for complainants.

*T. D. W. Yonley* and *J. N. Stevens,* for defendants.

BREWER, J., (HALLETT, J., *concurring.*) The facts in this case are as follows: In the fall of 1883, Mrs. Newton, one of the complainants, was the owner of a ranch near the city of Denver, which was subject to two liens of $6,000. Negotiations were had between her, her husband acting as her agent, and one E. F. Lamb, which resulted in an agreement for the conveyance of this ranch at an agreed price of $15,000; purchaser to assume the payment of the liens of $6,000, and to pay her the balance in dry goods. In pursuance of this agreement, a deed was made by her and her husband to Mrs. Vira Lamb, the wife of E. F. Lamb. The dry goods, which were packed in boxes stored in a warehouse in Denver, were delivered to her, and by her disposed of at private sale and by auction. Within 14 days after this conveyance, Mrs. Lamb and her husband conveyed the land to J. Jay Joslin, who thereafter conveyed it to the Arapahoe Land & Cattle Company. As a matter of fact, Joslin was the owner of these dry goods, and Lamb in the transactions was acting simply as his agent. Mrs. Newton, on examination, found the goods to be far from such as she claims they were represented to be. Nevertheless she sold and disposed of them as heretofore stated. She claims that she was ignorant of the fact that Joslin was principal, but supposed all the time that the goods belonged to Lamb, and that, after she had discovered the inferior quality of the goods, she instituted no suit, because she found that Lamb was insolvent; but, after some months, ascertaining that Joslin was the real party in interest, she commenced an action against him in the district court of Arapahoe county for a breach in warranty of these goods. Answer was filed, and the cause went to trial, which resulted in a verdict in her favor. The judge of that court set aside the verdict. Thereupon she dismissed that action, and commenced a similar action in the superior court of Denver, in which

she claimed that there was a fraudulent warranty, and sought to recover damages therefor from Joslin. The cause was tried first by a jury, but the jury hung, and were discharged. At the succeeding term a jury was waived by consent of parties, and the trial was had before the judge of that court without a jury, and judgment was entered in that trial in favor of the defendant; and now the complainants, Mr. and Mrs. Newton, come into this court, and file a bill making Mr. and Mrs. Lamb, J. Jay Joslin, and the Land and Cattle Company defendants, in which bill is narrated all the frauds which they claim were perpetrated on them by Joslin through his agent, Lamb, and the various transfers of title from Mrs. Lamb to Joslin, and from Joslin to the company, and the circumstances of the trial above referred to; and then it alleges that that judgment should be regarded as null and void, because obtained by perjury, and the corruption and bribery of the judge.

As might be expected, a very bitter and acrimonious controversy has followed these charges. The matter which, of course, first arrests attention, is that of the alleged corruption and bribery of the judge of the superior court; for, if these grave charges were true, not only would the judge himself receive the just condemnation of every honest man, but in every court the judgment which he had sought by his wrong to lift up as a barrier to truth and justice would be wholly disregarded. Such charges are grave ones, and ought not to be lightly made. Upon what evidence are they based? *First*, it is claimed by counsel for the complainants that the judgment itself is such an outrage that no honest man could have pronounced it; and, *second*, he says that the surrounding circumstances are such as indicate corruption.

Noticing the second matter first, I premise by saying that I have no reason to doubt the good faith of Mr. Green, the counsel for complainants, or that he is acting otherwise than from a sense of duty. He feels, doubtless, that his client has been grossly wronged, and, failing of the redress which he believes she is entitled to, he fancies that the judge who decided against him is party to the wrong, and construes the most innocent and ordinary acts into evidence of such participation. While conceding good faith to Mr. Green, I am compelled to add that the matters to which reference is made as evidences of wrong-doing are so frivolous and trifling that I am amazed to hear them mentioned. Let me mention them. On the first trial, while the jury were out, it appears that Judge RODGERS called a moment at the office of the counsel for the defendant. As explained, it appears that, when the court took a recess at 12 o'clock, the jury having been out all night, Judge RODGERS said that he would call at the offices of the respective counsel, and notify them to be present at 2 o'clock, as he thought he should then discharge the jury. Just after he left the court-room, the jury sent him a communication, declaring their inability to agree. The bailiff followed him, overtook him at the office of Mr. Marsh, defendant's counsel, and gave him this communication. On reading it, he informed Mr. Marsh, requesting him to attend at 1 o'clock, and prepared a note, which he sent to Mr. Green by the bailiff, asking him also to be present at 1 o'clock.

Somehow or other, the note failed to reach Mr. Green; but, as Mr. Green's partner was present at 1 o'clock, the jury was called in and discharged. At the last trial, when Mrs. Newton was being sworn, before the oath had been fully administered, she was dropping her hand, and the judge spoke to her sharply and angrily, as she says, and told her to keep her hand up. Further, on the last day of the trial, during the noon intermission, Mr. Marsh, the defendant's counsel, was seen in the chambers of the judge adjoining the court-room. The judge's room was separated from the sheriff's office by a thin partition, running only part way up to the ceiling, and the doors were standing open. The bailiff, who during the intermission had locked the doors of the court-room so that no one could enter, when he came back found Mr. Marsh in the judge's room, thus waiting for the opening of the court-room. Further, after the testimony was finished, one of complainant's counsel made his argument, and then, without waiting for further argument, the court decided the case.

Now, these are matters which are gravely presented to this court as evidences of corruption. It is true counsel for complainant says that, if the judgment had been right, these facts would not be significant; but, as he says, the judgment was wrong, and therefore these matters are evidences of corruption. Could anything be more frivolous? Putting one side all matters of explanation, could any suspicion arise from such conduct? Does not every lawyer know that the chambers of a judge are open, and is he not going there freely, either for business or social purposes? The learned counsel for complainant, who presents these matters, has more than once, in my brief visits to Denver, called alone at my chambers for business and social purposes; and I should have felt humiliated and insulted if I had for one moment entertained the thought that he supposed that by such visits he was exposing me to the charge of corruption, if I happened to decide any cases in his favor at or about the time of such visits. As I understand the matter, it is the right of a judge, nay more, I think it is his duty, to maintain pleasant personal, social relations with the members of the bar practicing before him; that he should maintain such relations as to feel that he is personally welcome at their offices, and that they are free to visit him; and I am sure that no man, unwarped by feeling, would think of mentioning these matters as evidences of corruption. Nay, more: if I understand anything of human nature, these very facts are strong evidences that there was no corruption. The conscious scoundrel magnifies little matters. He avoids everything that he imagines can in any manner be construed into evidence of guilt; and, if Judge RODGERS had been corrupted to pronounce this judgment, it is certain that he would, with the utmost care, have avoided any visible communications with the man who was corrupting him. He would scrupulously and carefully have avoided every connection with him which might come to the knowledge of others; and on the trial of the case, instead of stopping at the close of the one argument, he would, with apparent patience, have listened to everything that all the counsel had to offer. Instead of speaking sharply to the

complainant, his care would have been to exhibit the utmost politeness. Every act which is referred to, so far from indicating corruption, is potent evidence of conscious integrity and rectitude of purpose.

Was it strange that he decided the case after listening to one argument? Twice all this testimony had been presented to him. Once he had listened to the arguments of both counsel, and how could it be expected otherwise than that his mind had come to some conclusion? And yet the fact that he failed, on the trial, to listen to two speeches, is presented as evidence that he was consciously purposing wrong. My experience, and it has been no brief one, has shown me that he who makes the most complaint at not being heard sufficiently is the one whose talk contains least of argument, and helps the least to a determination of the questions presented. I have noticed these matters more at length than they deserve, but the gravity of the charges seem to compel at my hands this comment upon the evidence. I can only say that it is all more baseless than the shadowy fabric of a dream.

As I have said, counsel concedes that these matters, apart from the case itself, are insignificant; and rests his case mainly on what he considers the gross outrage of the decision, and insists that this, in itself, is alone enough to justify this court in pronouncing the judgment corrupt. He puts this illustration: If a robber should assault me on the streets, and take from me my money, and I should sue him for that money, and the judge should render a judgment in favor of the defendant, could such judgment be accounted for on any honest hypothesis? I take the illustration which he suggests, and say to him that, if he failed to commence his action until after the statute of limitations had wrought a bar, the judge who would not render a judgment in favor of the defendant, notwithstanding the enormity of the original outrage, would be unworthy of his place on the bench. I do not think it would be proper for me to express my opinion as to the merits of that case; this court cannot sit as a court of error. If mistakes were made, the supreme court of Colorado is the tribunal to correct them, and its high reputation for purity and ability is guaranty that any mistake of the trial judge would not fail of correction. I may be permitted, however, to notice this: Counsel assumes that his client's statements of the representations, and her knowledge of the ownership, and of the reasons of her subsequent conduct, are absolutely true. That may be so; and his client's appearance on the stand before me was that of a bright, intelligent, candid woman,—an appearance that impressed me strongly in her favor; but the record shows contradictory testimony of other witnesses presented before Judge RODGERS, and they were not personally before me. Perhaps the judge believed their story, rather than hers. I do not know. Certain it is that, after she received, opened, and examined the goods, a long time elapsed before any proceedings, if, indeed, any complaints were made. I do not mean to say that this inaction on her part would deprive her of her rights, in case she had been defrauded. I simply notice the fact that, by common rule of decision, such inaction is very significant.

As I said, I do not intend to express any opinion on the merits of that

case, for I think it would be improper to assume, in any respect, the attitude of a court of error. I have simply mentioned these matters to show that there were questions to be decided, and that only intensity of personal feeling could lead to the assertion that the judgment was so grossly and manifestly erroneous and unjust as to be evidence of corruption. I have no hesitation in saying that there is nothing in the case before me that justifies a declaration that this judgment was a corrupt one. I think this ends the case. Counsel, it is true, insists that, although this judgment might be conclusive in favor of Joslin, it would not be conclusive in favor of Lamb, who actually made the representations; and that in this proceeding complainants are entitled to a finding as against Lamb, and an adjudication that the amount thus found is a lien upon the land, even in the hands of the cattle company. This is a mistake. Joslin stands by the judgment of the superior court acquitted of wrong, and the title he held was free from any burden of lien in favor of these complainants. Holding such title, he conveyed it to the cattle company; and while it may be true—and as to that I express no opinion—that that judgment in favor of Joslin is no protection to Lamb, still any relief against him must be sought by an action at law, and not by this equitable proceeding.

A decree will be entered dismissing the bill.